# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH
### NO. 02-14-00249-CR



SAMUEL JAMES GRAY                                        APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1272861D

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

A jury convicted Appellant Samuel James Gray of the offense of knowingly causing serious bodily injury to a child.  *See* Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp. 2014).  The trial court assessed his punishment at thirty years' confinement and sentenced him accordingly.  In three issues, Gray argues that

---

[1]*See* Tex. R. App. P. 47.4.

the evidence is insufficient to support his conviction, that the trial court erred by admitting his grand jury testimony into evidence, and that he received ineffective assistance of counsel. We will affirm.

## II. FACTUAL BACKGROUND

In November 2010, Donovan[2] was a twenty-two-month-old toddler living with his mother, Marie, and his five-year-old sister in an apartment in Fort Worth. Gray, Marie's boyfriend, also lived in the apartment with the family. As Marie worked during the day, she arranged for Gray to take care of Donovan and to drive Donovan's sister to and from school.

On the morning of November 30, 2010, Marie went to work around 6:00 a.m. Around 10:30 a.m., Gray began calling Marie on her cell phone. She was unable to answer the phone initially, but a few minutes after Gray began calling her, Marie was able to get in touch with Gray. He told Marie that Donovan had fallen down some stairs at the apartment complex and was in and out of consciousness. Marie asked Gray if he had called 911, and Gray responded, "[T]hey're going to take me to jail." Marie hung up the phone and called 911, relaying the information that Gray had provided her. Shortly after Marie called

---

[2]To protect the anonymity of the child in this case, we will use aliases to refer to him and to his mother. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

911, Gray made contact with a 911 operator.[3]  Gray explained to the operator that the fall occurred when he opened the door to leave the second-floor apartment and Donovan took off down the stairs, falling half-way down them.

When paramedics arrived, they noticed Donovan lying on the couch inside the apartment; he did not respond to any stimuli.  Gray told the paramedics that Donovan fell down the last four steps of the stairs leading up to the apartment.  He also told them that Donovan did not cry after the fall.  Marshall Sharp, one of the paramedics, testified that he was surprised that Donovan did not exhibit any scratches or abrasions on his palms, noting that it is a natural reaction—even in a child as young as Donovan—to put one's arms out to stop a fall.  Sharp was concerned that Donovan was "posturing"—an involuntary movement of placing the arms over the chest.  Sharp testified that posturing "is a classic sign of increased pressure inside the brain."  Donovan was taken by ambulance to Cook Children's Hospital.  On the transport to the hospital, Donovan began developing a bruise on his forehead above his right eye.

When Donovan arrived at the emergency room, he was unresponsive to voice and touch.  Kelly Ratcliff, a pediatric trauma nurse who treated Donovan, noticed that he had bruising to his forehead and abrasions to his right scalp and the back of his head.  He also had bruising to his chest, inner thighs, and

---

[3]It is unclear from the record whether the 911 operator initiated the call to Gray—Marie had given Gray's cell phone number to the operator she spoke to— or whether Gray initiated the call himself.

buttocks. A CT scan revealed that Donovan had bleeding in his brain and that the bleeding was causing displacement in his brain. Gray explained to Ratliff that the injury occurred while he was walking with Donovan up the stairs to the apartment and Donovan fell backwards, hitting his head on one of the stairs. Gray told Ratliff that Donovan cried immediately after the fall. He said that he then took Donovan into the apartment and fed him cereal and that Donovan lost consciousness after eating the cereal.

Dr. Richard Roberts, a pediatric neurosurgeon, examined Donovan to determine the extent of his injuries and whether he needed surgery. Dr. Roberts testified that Donovan had a subdural hematoma—a bleeding between one of the coverings of the brain—as well as brain swelling. He also testified that Donovan experienced a mid-line shift—a shifting of the brain to accommodate swelling inside the brain. Dr. Roberts opined that the danger presented by a mid-line shift is that the brain will swell to a point in which there is no room in the skull for the swelling. The fear is that the swelling will cause the brain to get pushed over far enough to apply pressure to the brain stem—the part of the brain that drives respiration and heartrate. Dr. Roberts performed a craniotomy on Donovan—a procedure where bone is removed from the skull—in order to evacuate the blood from his brain to make room for the swelling. Dr. Roberts testified that Donovan was at a substantial risk of death prior to the craniotomy.

Subdural hematomas, according to Dr. Roberts, can be formed when there is a great amount of acceleration within the brain followed by a sudden

4

deceleration. He testified that subdural hematomas are typically caused by "high-energy" events, like a motor vehicle accident or a fall from a second-story window. Dr. Roberts testified that he had never seen a fall down three steps lead to a subdural hematoma. In his experience of treating children who fell down steps, the children were typically treated for nonsurgical close-head wounds and concussions.

While noting that Donovan did not have a skull fracture—an injury common when the head is struck against a hard surface—Dr. Roberts testified that Donovan's subdural hematoma could have been caused by his head being struck against a hard or soft surface and that the bruising to his forehead was consistent with that sort of contact. Dr. Roberts also opined that Donovan's mid-line shift was consistent with a high-energy impact or deceleration.

Sergeant Amy Ladd, an officer who was in the Fort Worth Police Department's crimes against children unit during November 2010, was assigned to investigate the circumstances surrounding Donovan's injury. Sergeant Ladd testified that on the day of Donovan's injury she went to the apartment with a search warrant. She noticed that the car that Gray and Marie shared was in the complex's parking lot, and she assumed that Gray was inside the apartment. Sergeant Ladd testified that she spent ten to fifteen minutes trying to get Gray to open the door before he finally let her inside. While inside the apartment, Sergeant Ladd noticed that there was feces on the floor and feces smeared against the wall. There was also a pair of feces-stained underwear on the floor.

5

Sergeant Ladd testified that this caught her attention because in "a lot of the physical investigations that [they] do, [they] often find that the reason for the injury came after a potty training incident."[4]

Gray briefly visited Marie and Donovan at the hospital, but he left soon after arriving. Marie never saw Gray again. While she called Gray approximately twenty times, he never took any of her phone calls. On February 24, 2011, Sergeant Ladd prepared an arrest warrant for Gray. Gray was not arrested, however, until nearly a year later because law enforcement was unable to locate him.

Following his arrest, Gray testified before a grand jury. He told the grand jury that after he dropped Donovan's sister off at school, he and Donovan stopped at a grocery store to pick up some breakfast. He testified that as they were walking up the stairs to the second-floor apartment, he had groceries in one hand and was holding Donovan's hand with the other. He stated that Donovan got loose from his hand and then fell back and tumbled down "three or four steps." He testified that Donovan seemed fine immediately after the fall and that he did not even cry. The grand jury ultimately indicted Gray for knowingly causing serious injury to Donovan by either shaking him with his hands or by striking his head against a hard or soft surface.

---

[4]Marie testified that both she and Gray had worked on potty training Donovan.

### III. SUFFICIENCY OF THE EVIDENCE

In his first issue, Gray argues that the evidence presented at trial was insufficient to support his conviction for knowingly causing serious bodily injury to a child. Namely, Gray contends that the State did not establish the manner and means used by him to injure Donovan.[5] Gray points to a statement made by the prosecutor during closing that "[w]e're never going to have the exact manner and means if the defendant isn't going to tell us specifically."

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we

---

[5]Gray clarifies in his reply brief that he challenges sufficiency to prove any criminal conduct.

may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246; *Malik*, 953 S.W.2d at 240. A hypothetically correct jury charge for the present offense of assault causing serious bodily injury to a child would ask whether Gray knowingly caused serious bodily injury to Donovan. *See* Tex. Penal Code Ann. § 22.04(a); *Thomas v. State*, 303 S.W.3d 331, 333 (Tex. App.—El Paso 2009, no pet.).

Several courts have held that the manner and means of the injury alleged is not an essential element of an assaultive offense and therefore is not included

8

in the hypothetically correct jury charge. *Thomas*, 303 S.W.3d at 333; *Rodriguez v. State*, 274 S.W.3d 760, 767 (Tex. App.—San Antonio 2008, no pet.); *Phelps v. State*, 999 S.W.2d 512, 516 (Tex. App.—Eastland 1999, pet. ref'd); *see also Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007) (holding that injury to a child is a "result of conduct" offense).[6] A variance between the manner and means alleged and the actual manner and means used does not preclude a conviction. *Thomas*, 303 S.W.3d at 333. Even though the State may include the manner and means in the indictment, it will be disregarded in a hypothetically correct jury charge. *See Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) (holding variance immaterial in aggravated assault case when indictment alleged that the defendant hit the victim and twisted her arm "with his hand" and evidence showed that the defendant threw the victim against a wall); *Thomas*, 303 S.W.3d at 333 (holding that variance in the manner and means alleged—striking the victim with the defendant's hand—and the actual manner and means used—pushing the victim—was immaterial); *Botello v. State*, No. 08-04-00127-CR, 2005 WL 2044667, at *2–3 (Tex. App.—El Paso Aug. 25, 2005, pet. ref'd) (not designated for publication) (holding that variance in the manner and means alleged—striking the victim's head against a door frame— and the actual manner and means used—pushing the victim—was immaterial);

---

[6]We note that this court made the same holding in an unpublished opinion. *See Fritzching v. State*, No. 02-10-00431-CR, 2012 WL 1222033, at *4 (Tex. App.—Fort Worth Apr. 12, 2012, pet. ref'd) (mem. op., not designated for publication).

*Phelps*, 999 S.W.2d at 518 (holding that the fact that the State did not present evidence of the manner and means alleged—striking the victim in the head with the defendant's hand—was immaterial where the hypothetically correct jury charge would not have included the descriptive phrase "with his hand").

**B. The Evidence is Sufficient to Support Gray's Conviction**

Here, there was evidence that Gray struck Donovan's head against a hard or soft surface. Dr. Roberts testified that Donovan's injuries—a subdural hematoma and a mid-line shift—were consistent with his head being struck against a surface. The fact that Donovan was developing a bruise on his forehead on the way to the hospital is further evidence that his head was struck against a surface.

The jury could have found that Gray's constantly changing story as to how Donovan was injured was evidence of his consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (noting that making false statements to cover up a crime is evidence indicating a consciousness of guilt and is admissible to prove the commission of the offense); *Couchman v. State*, 3 S.W.3d 155, 164–65 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that defendant's changing story was evidence of consciousness of guilt); *Comeaux v. State*, 413 S.W.3d 176, 187 (Tex. App.—Beaumont 2013) (holding that the jury is allowed to infer a consciousness of guilt when the defendant lies to the police), *aff'd*, 445 S.W.3d 745 (Tex. Crim. App. 2014). Moreover, the essential aspect of Gray's version of what happened—that Donovan fell down three or four stairs—is

not supported by the evidence. Dr. Roberts testified that he had never seen a case in which a child's fall down three steps caused a subdural hematoma.

Gray devotes much attention in his brief to discussing *Castillo v. State*, 7 S.W.3d 253 (Tex. App.—Austin 1999, pet. ref'd), a case that Gray says is "very similar" to his own. In *Castillo*, the defendant was indicted for intentionally and knowingly causing serious bodily injury to a child. 7 S.W.3d at 254. The indictment specifically alleged that the defendant either struck the child with his hands or struck the child's head against a wall or a floor. *Id*. at 255. The evidence at trial, however, demonstrated that the victim's injuries were characteristic of a child who had been "shaken back and forth at a very rapid rate of speed." *Id*. at 256. Notably, the child did not have any evidence of skin bruising or swelling but only injuries consistent with a deceleration-type injury. *Id*. The State's doctor testified that the child's "injuries were totally consistent with a shaking-type injury and found no evidence that his head actually hit an object." *Id*. The court of appeals reversed the defendant's conviction and ordered an acquittal, holding that the evidence was legally insufficient to support a conviction for "recklessly injuring a child by striking." *Id*. at 262.

As a preliminary matter, we note that *Castillo* is distinguishable from the facts presented in this case. Here, Gray was indicted for both shaking Donovan with his hands and for striking Donovan's head against a hard or soft surface. Unlike the child in *Castillo*, here, there was evidence that Donovan's injuries were caused by his head being struck against a hard or soft surface. Moreover, as

11

noted above, a variance between the manner and means alleged and the actual manner and means used does not preclude a conviction. *Thomas*, 303 S.W.3d at 333; *see Johnson*, 364 S.W.3d at 298. To the extent that *Castillo* can be read to suggest otherwise, we decline to follow it.

Considering the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Gray knowingly caused serious bodily injury to Donovan. We thus overrule Gray's first issue.

## IV. ADMISSION OF GRAY'S GRAND JURY TESTIMONY

In his second issue, Gray argues that the trial court erred by admitting into evidence his grand jury testimony. Gray contends that he was not properly admonished prior to testifying before the grand jury and that he "was promised by the State that nothing would be used against him." Gray points to the following statement made by the prosecutor before Gray testified before the grand jury: "There's just two things that you need to know about the oath that she just read to you. One is that you have to tell the truth because you're under oath. And secondly is that everything that goes on in here is secret. Okay?"[7] Gray

_____

[7]We note that immediately after making this statement to Gray, the prosecutor went on to tell him:

> Your testimony before this grand jury is under oath. Any material question that is answered falsely before this grand jury subjects you to being prosecuted for aggravated perjury. You have the right to refuse to make answers to any question the answer to which would incriminate you in any manner. You have the right to have a lawyer

12

contends that because the prosecutor said that everything was a "secret," it left the impression upon him that the State would not use his testimony against him at a later date and would not pursue charges against him.

At his trial, the State introduced Gray's grand jury testimony into evidence. Gray's attorney made the following objection to the introduction of Gray's grand jury testimony, "Judge, I would like to object to this coming in because he has the right not to testify. He has not testified. And there is another way of getting sworn testimony in." The trial court overruled that objection, allowing Gray's grand jury testimony to come into evidence.

The complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). To determine whether the complaint on appeal comports with that made at trial, we consider the context in which the complaint was made and the parties' shared understanding at that time. *Clark*, 365 S.W.3d

---

present outside this chamber to advise [you] before making answers to questions you feel might incriminate you. Any testimony you give may be used against you at any subsequent proceeding.

13

at 339; *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009); *Pena*, 285 S.W.3d at 464.

We hold that Gray did not preserve the argument he now makes on appeal—that he was not properly admonished prior to his grand jury testimony, so it was inadmissible—when his grand jury testimony was introduced at trial. While Gray's attorney objected to the introduction of his grand jury testimony, the objection made at trial does not comport with the objection now made on appeal. *See, e.g., Lovill*, 319 S.W.3d at 691–92 (requiring legal basis of complaint at trial to be the same as that raised on appeal). We thus overrule Gray's second issue.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Gray argues that he received ineffective assistance of counsel.

### A. Standard of Review

To establish ineffective assistance of counsel, Gray must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

14

Direct appeal is usually an inadequate vehicle for raising an ineffective-assistance-of-counsel claim because the record is generally undeveloped. *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson*, 9 S.W.3d at 813–14. In evaluating the effectiveness of counsel under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record or when counsel's reasons for failing to do something do not appear in the record. *Menefield*, 363 S.W.3d at 593; *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain [her] actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel is not given that opportunity, we should not conclude that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

## B. The Record is Insufficient to Establish Ineffectiveness

15

Here, Gray alleges that he received ineffective assistance of counsel when his attorney did not object to certain statements made during voir dire concerning the definition of the term "knowingly." Specifically, Gray complains that his attorney should have objected when the prosecutor made the following statements:

> A person knows what he is doing can reasonably result in serious bodily injury. Not that the injury will happen or that they knew it would happen, but that they knew an injury could reasonably result from that.
>
> . . . .
>
> So say that someone else punches someone in the jaw, and they don't mean to break their jaw, they just want to hurt them, but then their jaw is broken. Do you think that punching someone in the face, do you think that that's something that could reasonably result from that is a broken jaw?
>
> . . . .
>
> So intentionally is the example I gave that if a person walks up to another person and shoots that person in the head, it can easily be inferred that their intent was to kill that person. As opposed to knowingly, maybe you hit someone in the face and your intent is to just hurt that person, just cause bodily injury, but you hit them so hard that you actually break their jaw. Even though you didn't intend to break their jaw, you knew that if you hit someone like that, that it could break their jaw. Do you see the difference?
>
> . . . .
>
> Knowingly is a person has an action and the action they committed maybe that's not necessarily what they intended to cause, but it could be reasonably inferred that it could be caused by that.
>
> . . . .

16

[T]he difference with knowingly [versus intentionally] is that you should know by your conduct that your conduct could result in this injury."

Gray also complains that his attorney should have objected when the trial court made the following statement in front of a prospective juror, "[T]o take [the prosecutor's] example of punching somebody in the jaw. Okay? If you believe that somebody punched somebody in the jaw, do you reasonably believe that that could have caused the result?"

Gray contends that these statements lowered the State's burden of proof. The State counters that the prosecutor gave the correct definition of "knowingly" during voir dire, that there is no tangible difference between the explanations of the term "knowingly" given during voir dire and the definition found in the penal code, and that there is no record to substantiate Gray's claim that his attorney employed an unprofessional strategy.[8]

We agree with the State. Although Gray filed a motion for new trial, he did not complain of ineffective assistance in his motion, and no hearing was held on the motion. Thus, the record is silent as to Gray's attorney's trial strategy in failing to object to the statements made by the prosecutor and the judge during voir dire. Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *See*

_____

[8]"A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Tex. Penal Code Ann. § 6.03(b) (West 2011).

17

*Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *Edwards v. State*, 280 S.W.3d 441, 445 (Tex. App.—Fort Worth 2009, pet. ref'd). As noted above, trial counsel "should ordinarily be afforded an opportunity to explain [her] actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593.

Based on the record before us, in light of the strong presumption of reasonable professional assistance by defense counsel, and in the absence of any opportunity for defense counsel to explain her strategy for not objecting to these statements, we cannot say that Gray has met his burden of showing by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms. *See Thompson*, 9 S.W.3d at 813; *Edwards*, 280 S.W.3d at 445. Because Gray has not satisfied the deficient-performance prong of *Strickland*, we overrule his third issue.

## VI. CONCLUSION

Having overruled Gray's three issues, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 15, 2015

18